KELLY v. HERRALL, Ex'r, etc.

(*Circuit Court, D. Oregon.* May 26, 1884.)

1. TAX DEED—EFFECT OF, AS EVIDENCE.

   Notwithstanding the act of 1865, (Or. Laws, § 90,) making a tax deed conclusive evidence of the regularity and validity of the prior proceedings, in an action by the owner of the property to recover the possession from the grantee in such deed, or his assignee, it may be shown that no warrant issued for the collection of the tax levied on the property, or that there was no sale thereon on that account.

2. WARRANT FOR THE COLLECTION OF A DELINQUENT TAX.

   A warrant for the collection of a delinquent tax was received by the sheriff on May 5th, and on Friday, July 6th, 62 days thereafter, he sold the same. *Held*, that the warrant was dead and the sale void; and that the sale could not be made after the return-day of the writ, which was either the first Monday in July, or the sixtieth day after its receipt by the sheriff, and possibly 30 days in addition, in case a prior appointed sale was postponed to some day within that period for sufficient cause, with the approval of the county court.

3. ASSESSMENT ROLL—DESCRIPTION OF PROPERTY THEREIN.

   In 1876 there was only one place in Multnomah county laid out and recorded as the "Portland Homestead," containing a lot 3, in block B, of which Mary Kelly was the owner. The assessor entered the same on the assessment roll for taxation in her name, and described it as "lot 3, in block B, Port. Homstd. Ass.," and valued it for taxation at $100. *Held*, that the description was sufficiently certain.

4. REVENUE LAWS—CONSTRUCTION OF.

   Laws for raising revenue for the support of the state are remedial in their character, and proceedings taken under them for the purpose of ascertaining the amount a citizen ought to contribute to the common weal ought not to be considered as taken *in invitum*, or hostile to him or his interests, but rather as proceedings in his behalf, in which it is his duty to co-operate with the state, so as to enable it to reach a correct and just result.

Action to Recover Possession of Real Property.

*H. B. Nicholas*, for plaintiff.

*Robert Bybee*, for defendant.

DEADY, J. This action is brought by the plaintiff, a citizen of the state of California, to recover the possession of lot 3, in block B, in Portland Homestead. It was commenced against Jacob Fisher, a citizen of Oregon. After the cause was at issue, Fisher died, and on February 22, 1884, his death was suggested to the court and supported by the affidavit of the plaintiff's attorney, whereupon the action, on motion of the latter, was continued against the executor of the deceased, George Herrall. This is according to the practice pre-

scribed in such cases by the Oregon Code of Civil Procedure, § 37, but it is doubtful if the personal representative of a deceased defendant can be made a party to an action in this court in place of the latter, on the application of the plaintiff, otherwise than by a *scire facias* issued "twenty days beforehand," as provided in section 955 of the Revised Statutes. But, as the executor has since voluntarily appeared in the action, and by his counsel stipulated that the cause may be tried by the court without a jury upon the facts therein stated, in addition to those admitted by the pleadings, I suppose he is properly before the court as the defendant in the case, and that judgment may be given for or against him with the same effect as if he had been brought into the case by *scire facias*. See *Hatch* v. *Eustis*, 1 Gall. 160; *Barker* v. *Ladd*, 3 Sawy. 44.

It appears, from the admissions in the pleadings and the stipulations of the parties, that in 1876, and prior thereto, the plaintiff was the owner in fee of lot 3, in block B, in Portland Homestead, in the county of Multnomah and state of Oregon, according to the recorded plat thereof, and that in said year the assessor of said county entered on the assessment roll thereof for taxation, in the name and as the property of the plaintiff, "lot 3, in block B, Port. Homstd. Ass.," and valued the same thereon, for such purpose, at $100, upon which valuation a tax was afterwards levied by the proper county court, for state, county, and school purposes, of $1.50. The tax so levied upon said property not being paid or collected as provided by law, the same was returned by the sheriff before the first Monday in April, 1877, as delinquent, and thereafter entered by the county clerk on the list of unpaid taxes and "charged" to Mary Kelly, together with a description of the property as lot 3, in block B, in "P. H. Ass'n," which list was, on May 5, 1877, delivered to the sheriff, with a warrant attached thereto, dated May 3, 1877, "for the collection of the taxes therein mentioned and described," who, not being able to find any personal property belonging to the "delinquent," "thereupon" duly levied on the real property described in said list as follows: "Kelly, Mary, Portland H. Ass'n, lot 3, block B; tax, $1.05,"—and duly advertised the same for sale at the court-house door on July 6, 1877, by the description last aforesaid, and then and there sold the same, subject to redemption, to said Fisher, he being the highest bidder therefor, for the amount of said tax—$1.50—and $2.90 costs,—in all, $4.40,—and gave him a certificate thereof accordingly.

On July 12, 1879, the time for redemption having expired without any application being made to redeem the property, the sheriff executed a deed to the purchaser, in pursuance of said sale, for the following described property: "Lot 3, in block B, in the Portland Homestead Association, in Multnomah county, state of Oregon,"—who thereupon went into possession of the lot in controversy, and occupied the same until his death, in said county, on January 5, 1884, leaving a will in which George Herrall was named as executor, and to whom

letters testamentary were afterwards issued thereon by the proper county court.

It also appears from said stipulation "that if evidence is admissible to show the meaning of the abbreviation, 'Port. Homstd. Ass.,' as it appears in said assessment roll, it means 'Portland Homestead Association.'"

Formerly, a party claiming under a tax deed was held to strict proof of the legality and regularity of every step in the prior proceeding, from the listing of the property down to and including the sale. The application of the conservative maxim, *omia rite præsumuntur,* was not allowed; and it was assumed that nothing was done, or rightly done, until the contrary was shown. Owing, probably, to the great disparity between the real value of the property, in many cases, as in this, and the amount paid for it by the purchaser at the tax sale, the courts were astute to find some flaw in the proceeding, on account of which they might hold the deed invalid, and thus prevent what might be considered as a forfeiture of the property. In this state of the law, taken in connection with the fact that the process of the assessment and collection of taxes is generally in the hands of inexperienced and untrained persons, selected by popular election for short periods, it is not surprising that the sale of property for the non-payment of taxes has usually been regarded as a mere admonitory formality, which, at most, could only involve the delinquent owner in a "lawsuit" with the purchaser, in which the latter was quite sure to come out second best.

In Blackw. Tax Titles, 72, it is said that out of 1,000 such titles that had found their way into the appellate courts (1869) not twenty of them had proved "legal and regular" according to this severe test.

The duty of the owner to return his property for taxation, and to assist and co-operate with the state in ascertaining the exact amount that he ought to contribute to the public revenue, seems to have been overlooked, and the proceeding regarded and treated as a hostile, if not a predatory, one on the part of the state against the citizen, in which the latter was justifiable in getting off as cheaply as possible, or lying by and allowing his property to be sold for taxes, and then avoiding the effect of the sale, and escaping the payment of the tax altogether, by showing some defect or irregularity in the proceeding, that in a like transaction between man and man would be regarded as altogether immaterial. Blackw. Tax Titles, 125. But the difficulty, not to say injustice, of raising revenues by a system which in effect only reaches the diligent and conscientious citizen, in time attracted public attention to the necessity, if not propriety, of treating the proceeding for raising the public revenue as a proceeding founded on remedial legislation, and designed to promote the public good,—as a proceeding in which it is the duty of the citizen to co-operate with the state, at least up to the point of ascertaining what is due from him, and which, in common with other public proceedings,

is to have the benefit of the presumption, declared in the Or. Code of Civil Procedure, § 766, sub. 15, "that official duty has been regularly performed."

In Cooley, Tax'n, the learned author (383, note) suggests that too much importance has been attached to this idea that a proceeding for the assessment and levy of a tax is "hostile" to the tax-payer, and adds the following judicious and sensible comments:

"The proceedings in the assessment of a tax are not, in any proper sense, hostile to the citizen. They are, on the other hand, proceedings necessary and indispensable to the determination of the exact share which each resident or property owner ought to take, and may and ought to be supposed desirous of taking, in meeting the public necessity for a revenue; proceedings which the willingness of the tax-payer cannot dispense with, and which only become hostile when the duty to pay, once fixed, fails to be performed by payment. Then, and then only, do the steps taken by the government assume a compulsory form. Until then, the reasonable presumption is that government and tax-payer will act together in harmony, and that the latter will meet his obligation to pay as soon as the former has performed its duty in determining the share to be paid."

In time the legislatures of many of the states interfered, and relieved the purchaser at a tax sale from the intolerable burden of proving the regularity and legality of every step in the proceeding by making the tax deed *prima facie* evidence of the title of the purchaser and the regularity of all the prior proceedings.

In *Pillow* v. *Roberts*, 13 How. 476, Mr. Justice GRIER, in considering an Arkansas statute of this character, says:

"The evil plainly intended to be remedied by this section [96th] of the act was the extreme difficulty and almost impossibility of proving that all the very numerous directions of the revenue act were fully complied with antecedent to the sale and conveyance by the collector. Experience has shown that when such conditions were enforced, a purchaser at tax sales, who had paid his money to the government, and expended his labor on the faith of such titles in improving the land, usually became the victim of his own credulity, and was evicted by the recusant owner or some shrewd speculator. The power of the legislature to make the deed of a public officer *prima facie* evidence of the regularity of the previous proceedings cannot be doubted. And the owner who neglects or refuses to pay his taxes or redeem his land has no right to complain of its injustice. If he had paid his taxes or redeemed his land, he is, no doubt, at liberty to prove it, and thus annul the sale. If he has not, he has no right to complain if he suffers the legal consequence of his own neglect."

But this change in the law only shifted the burden of proof onto the party who contested the title of the purchaser, and any defect or irregularity in the proceeding could still easily be shown by such contestant from the public records or writings. On this account the statute did not furnish the protection to the purchaser that was expected; and therefore some of the states—for instance, Iowa and Oregon—have gone further in that direction and declared, in effect, that a tax deed shall be conclusive evidence of the title of the purchaser and the regularity of the prior proceedings, except in certain speci-

fied and essential particulars, concerning which it may still be controverted by evidence to the contrary and overthrown. But Judge Cooley, in considering this subject, (Cooley, Tax'n, 356,) says that the authority of the legislature to pass such statutes has this plain limit: "It cannot deprive one of his property by making his adversary's claim to it, whatever that claim may be, conclusive of its own validity. It cannot, therefore, make the tax deed conclusive evidence of the holder's title to the land." See, also, Cooley, Const. Lim. 368. And in *McCready* v. *Sexton*, 29 Iowa, 356, the court held that a statute of that state making a tax deed conclusive evidence that all the prerequisites necessary to a valid sale, so as to vest the title in the purchaser, had been done, is unconstitutional, so far as the essential prerequisites to the exercise of the taxing power is concerned, and that the following are of that character: The listing and assessing of the property; the levy of the tax thereon; the warrant to sell the same; and a sale thereon. This ruling has been adhered to in subsequent cases, and the result is that the statute is allowed to be only *prima facie* evidence that these essential prerequisites have been done, but as to all other steps in the proceeding, and even the *time* and *manner* of doing these, including the notice to sell, the deed is held to be conclusive. *Martin* v. *Cole*, 38 Iowa, 141.

The act of December 18, 1865, (Or. Laws, p. 767, § 90,) provides that if land sold for taxes is not redeemed within two years from the date of the certificate of sale, the purchaser or his assigns shall receive a deed therefor from the sheriff, containing a description of the property sold, the amount bid, the year in which the tax was levied, a statement that the tax was unpaid at the time of the sale, and that no redemption has since been made, which deed shall operate to convey a "legal and equitable title" "in fee-simple to the grantee" therein; and upon the delivery thereof "all the proceedings required or directed by law in relation to the levy, assessment, and collection of the taxes and the sale of the property shall be presumed regular, and had and done in accordance with law; and such deed shall be *prima facie* evidence of title in the grantee, and such presumption and such *prima facie* evidence shall not be disputed or avoided except by proof of either (1) fraud in the assessment or collection of the tax; (2) payment of the tax before sale or redemption after the sale; (3) that the payment or redemption was prevented by the fraud of the purchaser; and (4) that the property was sold for taxes for which the owner of the property was not liable, and that no part of the tax was levied or assessed upon the property sold."

The plaintiff contends that this tax deed is void for several reasons, most of which are, in effect, that the property is not sufficiently described in the assessment roll and the subsequent proceedings. It is not claimed that there was any fraud in the assessment or collection of the tax, or that it was paid before the sale or the property redeemed therefrom, or that such payment or redemption was prevented by the

fraud of the purchaser, or that lot 3, in block B, in Portland Homestead, was not liable to assessment and taxation in 1876 as the property of the plaintiff. The only ground, then, according to this act, upon which the validity of this deed can be attacked for defects in the prior proceedings, not apparent upon the face of it, is that mentioned in the last clause of subdivision 4 of section 90, aforesaid,— "that no part of the tax was levied or assessed upon the property sold." The terms "levied or assessed" are here used as convertible ones. But, strictly speaking, taxes are "levied," not assessed. Under the law of this state the assessment, which consists of the listing and valuation of the property, is made by the assessor, (Or. Laws, p. 754, § 29; Rap. & Law. Law Dict. "Assessment,") and upon this valuation the taxes are imposed or levied by the county court, and extended on the roll by its clerk. Or. Laws, 760–761. The assessment of land is made by entering, in the appropriate column in the assessment roll, the name of the owner and a description of the property, with its valuation, which, in case of a lot or block "situated in any city, village, or town," a plat of which is recorded, may consist of the number of such lot and block, with the name of the "village or town in which the same is situated." Id. p. 764, §§ 29, 30. In this case the assessment roll contains the name of the owner of the property in question, the number of the lot and block, the valuation of the same, and the amount of the tax levied thereon, and the only question is whether the place or village in which it is situated ("Portland Homestead") is sufficiently indicated by the abbreviation "Port Homstd. Ass."

This statute has not been construed by the supreme court of the state. It does not go as far as the Iowa act, by any means, but still it does undertake, among other things, to make the tax-deed conclusive evidence of a warrant for the sale of the property and a sale thereon,—two things which the Iowa court holds are essential to the validity of the tax deed, and of which it can only be made *prima facie* evidence. For the purposes of this case, it will be assumed that the Oregon statute should be limited and restrained in its operation according to the rule laid down in the Iowa court.

Upon this construction of the statute, the deed must be considered as only *prima facie* evidence that the prior proceedings were duly had and done; at least, in these four particulars, namely: (1) The assessment of the property; (2) the levy of the tax thereon; (3) the issue of a warrant for the non-payment of the same; and (4) the sale of the property thereon. As to these facts, the deed is not conclusive, and the contrary may be shown, and its invalidity thereby established.

By the fourteenth amendment the state is forbidden "to deprive any person of property without due process of law." And to make a tax deed conclusive evidence that the property which it purports to convey was assessed for taxation; that a tax was levied thereon, and

the same was sold upon a warrant issued for that purpose, for the non-payment of such tax, when in fact there was neither an assessment, levy, warrant, nor sale, or only any three of them,—is, in my judgment, such deprivation. If it is not, then a simple act of the legislature, declaring that the farm of A. is henceforth the farm of B., for no other or better reason than its sovereign pleasure, is "due process of law;" and the prohibition is nugatory in regard to the very authority it was intended to control. An assessment to Mary Kelly of lot 3, in block B, in "Salem Homestead," is not an assessment of such lot in "Portland Homestead;" and therefore a tax levied upon the former is not a tax levied upon the latter, and the proceeding will not support a sale of the latter for the non-payment of such tax. This is self-evident. But between a case of clear mistake as to the description of the property and a perfectly accurate one, there are many cases of imperfect or ambiguous descriptions, in which it is difficult to decide whether the description is sufficient or not.

In Cooley, Tax'n, 282, it is said that in listing land for taxation "it must be described with particularity sufficient to afford the owner the means of identification, and not to mislead him;" and that "a description that would be sufficient in a conveyance between individuals would generally be sufficient here.".

Of course, the abbreviation "Port." does not necessarily signify "Portland." Indeed, it may be admitted that, abstracted from its surroundings, it is as likely as not to stand for something else. But the letters "Homstd." come so near representing the word "Homestead," both to the eye and ear, that it may well be regarded as a case of misspelling, by the omission of the silent or obscure letters, rather than an abreviation. The description may then be read, to begin with, as "Port. Homestead." And now take into consideration the fact that there is a "Portland Homestead" in this county, and only one, and that in the year 1876 Mary Kelly owned lot 3, in block B, therein, which was then liable to assessment and taxation, and it is apparent that "Portland Homestead" was meant and understood by the description used. Had the plaintiff examined the assessment roll it is difficult to see how she could have been misled by this description, or failed to learn from it that her lot 3, in block B, in Portland Homestead, was assessed for taxation.

The false addition "Ass." may be rejected from the description of the place. It is evidently an abreviation of "Association," and its insertion in the description apparently arose from the fact that the name of the proprietor of the property includes the name of the homestead, and is so far identical with it. The property could not be situated in the association—the collection of persons or legal entity that laid out and named the town. The manifest falsity of this particular in the description, and the sufficiency of that which remains to indicate the location of the lot, brings the case within the operation of the maxim, *falsa demonstratio non nocet*—a mere false description

does n )t make an instrument inoperative. Broom, Leg. Max. 629. See, a so, 1 Greenl. Ev. § 397.

My conclusion upon this point is that the proof furnished by the sheriff s deed of the assessment of the property, and the levy of the tax th 'reon, is not overcome by the introduction of the assessment roll. On the contrary, both these facts are sufficiently shown by the entrie: thereon. See *Mecklem* v. *Blake*, 19 Wis. 397.

The legality of the sale is questioned by the plaintiff, on the ground that it was not made during the life of the warrant, but after the return-d ay thereof.

By section 82, Or. Laws, 766, a warrant for the collection of a delinque at tax is made equivalent to an execution, except as in chapter 57 otl erwise provided. By section 275 of the Code of Civil Procedure, a i execution against property is made returnable within 60 days after ts receipt by the sheriff; but by section 290 of the same it is provic ed that the sheriff may, "for want of purchasers, or other sufficient :ause," postpone a sale, with the consent of the plaintiff in the exceu ion, "not exceeding thirty days beyond the day at which the writ i; made returnable." It appears from the sheriff's return in this case that he received the warrant on May 5th, and made the sale t iereon 62 days thereafter, on July 6th. The return does not state distinctly when the levy was made, but it is clear that it was made during the life of the warrant, for it appears that upon the receipt of the writ the officer levied upon the property, and published a notice of the sale thereof for four weeks before the same took place.

At common law, when an officer has entered upon the execution of a wri , as by making a levy therewith, before the return-day thereof, he may ell the property thus levied on at any time thereafter. *Wheaton* v. *Sexton*, 4 Wheat. 504; *Remington* v. *Linthicum*, 14 Pet. 92; Freem. Ex'ns, § 106. But it seems this power is limited in this state by said ection 290, the effect of which is, in my judgment, to require a sale on execution to be made within the life of the writ, or at most withi 1 30 days after the return-day thereof. And this postponement for 30 days can only be made with the consent of the plaintiff indorsed on th writ, and for a cause thereon stated. Whether this provision conce rning the postponement of a sale, and requiring the consent of the p aintiff to authorize it, is applicable to a warrant for the collection of a delinquent tax, may be doubted. But, if it is, the county, as repre iented by the county court, ought to be considered the plaintiff in the writ and give the consent to the postponement. But such postj onement can only take place after a day appointed for the sale within the life of the writ, and for a cause then ascertained to exist by the officer, which fact ought to be stated in his return. In this case the return does not show that the case was postponed to July 6th, )ut that it was appointed and advertised for that day in the first instance; so that there is no doubt that the sale was made after the life of the warrant, and not upon an adjournment from an earlier day

within such life, as required by said section 290 in case of an execu-
tion.

And by section 81 (Or. Laws, 766) it is provided that within 10 days
after the first Monday in April the county clerk shall make and de-
liver to the sheriff "a true and correct list of the taxes returned unpaid,
and a correct description of the land or town lots, if the same can be
made, and to whom such taxes are charged,   *   *   *   with a writ
attached thereto," commanding him to collect the same out of the
goods and chattels of the delinquent, and, if none be found, then to
levy "upon the real property, as set forth in said tax-list," and to pay
over all moneys so collected by the first Monday in July thereafter.
In my judgment, there is in this provision a necessary implication
that the warrant for the collection of the tax is not only returnable
by the first Monday in July, with the "moneys" made thereon, but
that it must be executed before that time by the sale, if need be, of
the property mentioned therein, or an offer to sell the same at a time
and place appointed for that purpose.

By the return in this case it appears that the day of sale—July
6th—was a Friday; from which it is shown that the first Monday in
July of that year occurred on the second of the month, and that the
sale took place four days after the time prescribed for that purpose by
this statute.   So that, whether this warrant, as to the time within
which a sale could be made in pursuance of a levy under it, is to be
considered an execution and subject to said section 290 of the Code,
or controlled by said section 81 of the tax law, it appears that the
sale of this property was made after the time limited by law therefor.

It being assumed, as has been said, that the act of 1865 must be
construed so as to allow the tax deed to be overcome by showing that
there was no sale of the premises, the question arises whether a sale
upon a warrant, after the time within which it is required to be made,
is a valid sale.   If a sale is actually made upon or in pursuance of
the authority of a lawful warrant, no mere irregularity in the man-
ner and time of making such sale can be shown to avoid the deed.
On the contrary, it is conclusive evidence of the regularity of the sale
in all such respects.   For instance, it cannot be shown that the sale
was without or upon an insufficient notice, or that it was made else-
where than at the court-house door, or otherwise than between the
hours of 10 and 4 o'clock in the day-time, as prescribed by section
93, (Or. Laws, 768.)   But where the sale is made without any au-
thority in the officer for that purpose, as where there is no warrant
for the collection of the tax, the fact may be shown to avoid the deed.
And taking it for granted that the authority to sell under the warrant
of May 3d was gone before July 6th, then the sale in this case was
essentially illegal, and the deed made in pursuance thereof void.

There is also a question made in the case as to whether there ever
was a warrant issued to collect a delinquent tax "charged" to Mary
Kelly and levied upon this "town lot."   The warrant is "attached"

to the 'list" of "unpaid" taxes, and only authorizes the collection of a tax levied on "the lands or town lots" described therein. In the delinquent roll the only property which appears to have been assessed to Mary Kelly is lot 3, in block B, in "P. H. Ass'n." With our present knowledge of the subject it may be quite apparent that the letters "P. H." were intended to signify "Portland Homestead," and doubtless they were so intended by the officer who wrote them. But, reading them in the light of the proceeding alone, it is just as reasonable to infer that they stand for Pleasant, Prospect, or Plymouth Home or Hollow. If any weight is to be given in the direction contained in section 81, aforesaid, to the effect that the list of unpaid taxes shall contain a "correct description" of the property on which they are levied, it seems that the place in which a town lot is situated ought to be more certainly designated than by the initial letter of its name. And in this connection consideration ought to be given to section 33, (Or. Laws, 755,) in which it is declared that "it shall be sufficient to describe lands in all proceedings relative to assessing, advertising, or selling the same for taxes, by initial letters, abbreviations, and figures to designate the township, range, section, or part of section, and also the number of the lots and blocks." From the character of this provision and the nature of the subject there arises, in my judgment, a strong implication that, in describing lands for such purpose, initial letters shall not be sufficient otherwise or further than is here expressly permitted.

It is also objected to the warrant that it is illegal because it was not issued and delivered to the sheriff within ten days from the first Monday in April, as required by said section 81. But I think this is a matter of detail as to time or manner that the deed does and may conclude inquiry about. The description of the property in the deed is probably sufficient, notwithstanding the addition of the false particular "Association," to the name of the place, "Portland Homestead," in which the lot is situated. Without this word the designation of the place is correct; and, in obedience to the maxim, *falsa demonstratio non nocet*, it should be disregarded. But even if this maxim is not applicable here, upon the ground, as some authorities hold, that the deed is not the voluntary conveyance of the owner of the lot, and therefore no intention can be imputed to him in the premises, (*Bosworth* v. *Danzien*, 25 Cal. 298,) still the deed may be upheld on the maxim, *ut res magis valeat quam pereat;* the spirit of which it is said by SHAFTER, J., in *Bosworth* v. *Danzien*, is that nothing should be destroyed merely for the sake of destruction. And, acting upon this view of the question, the court in that case held that neither an assessment nor a tax deed is necessarily void because of a false call in the description of the land, unless it was sufficient probably to mislead the owner; and decided that a description in that case consisting partly of a line commencing at a certain point, and running 200 feet east, was sufficient, although it contained the fur-

ther contradictory words, "along Corbett street," because it was manifestly impossible that a line laid in that direction would run along Corbett street.   The false particular, "along Corbett street," was, therefore, rejected sooner. than that which was truly and well said or done should perish.   But on the ground already stated, that the sale of the lot was unauthorized and illegal, because it was made after the time limited by law, I must hold that the deed to Fisher is void.

The finding and judgment of the court will therefore be that the plaintiff is the owner in fee of the premises and entitled to the possession thereof, and that she recover the same, with costs and expenses.

It may be thought that I have given this case more consideration than the amount at stake on it demands.   But my excuse is, if any is needed, the importance of the questions involved in it, the uncertain and confused state of the law on the subject, and the further fact that I am required to construe and apply the revenue laws of the state touching questions that have not yet been passed on by its supreme court.   But, while sitting in this federal forum as a judge of the national government, I do not forget that the state is one of the pillars on which rests the fabric of that government; nor that I am a citizen of the former, and have as much interest in her well-being and respect for her authority as any who may profess more in this respect.